JUAN FLORES VALENTÍN ET AL., Petitioners, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, GERARDO CARREIRA MÁS, JUDGE, Respondent.

No. C-64-36.    Decided February 26, 1965.

*Noel Colón Martínez* for petitioners. *J. B. Fernández Badillo, Solicitor General,* and *J. F. Rodríguez Rivera, Assistant Solicitor General,* for respondent.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

Mr. Justice Hernández Matos delivered the opinion of the Court.

This is a review of an order denying a motion for suppression of evidence.

On April 11, 1963, Juan Flores Valentín and his wife Margarita Vega Matos were charged before the San Juan Part of the Superior Court with two violations of § 29 of the Narcotics Act of Puerto Rico, approved June 18, 1959.[1] They were charged that on or about February 13, 1963, and in San Juan . . . acting jointly and in common concert, they had in their possession and control the narcotic drug known as marihuana.

Six days prior to the day set for trial, they filed a motion for suppression of evidence. They alleged that the narcotic drug object of the information—cigarettes and cut marihuana—had been seized by police officers in the course of an illegal search and seizure of their "business-residence" situated in the ward of Puerta de Tierra, of San Juan, carried out at 4:30 a.m. of February 13, 1963, the illegality of which consists in that the search and seizure was carried out under the authority of a warrant which had been definitively served and executed a few hours before, in the town of Vega Baja, by the seizure of the revolver for which search and seizure the warrant had been exclusively requested and issued.

A hearing was held on that motion. Both parties offered oral and documentary evidence. On April 22, 1964, after briefs were filed, the incident was decided in open court against appellants in the following terms:

"A search warrant valid on its face, based on probable cause, having been issued, the court is of the opinion that the search

---

[1] Section 29 prohibits the holding, possession, conveyance, use, application, prescription, manufacture, preparation, or any transfer or receipt, as well as the introduction, concealing, and transportation in Puerto Rico of smoking opium, heroin, and marihuana.

of the house of Juan Flores Valentín and Margarita de Flores was not unreasonable, and it decides to deny, and does hereby deny, the Motion for Suppression of Evidence.

"The defense has moved for reconsideration and the court ratifies its order."

Petitioners assign the commission of two errors. The first is based on the trial court's refusal to give "evidentiary weight to a search warrant executed and returned to the issuing judicial authority, giving weight in turn to an oral testimony which varies the content of such warrant or return." The second is based on the fact that a search which is illegal, void, and unreasonable, and which constituted "transgression of the power invested by a search warrant in some public officers who already had in their possession the weapon object of such warrant," was held valid.

Since the two errors assigned are closely related, we shall discuss them jointly. We shall recite in the first place certain facts appearing from the evidence presented, documentary as well as oral.

On the morning of February 8, 1963, a triumvirate of our underworld formed by one "Jessie James," one "Charlie," and another individual named José Enrique Díaz Guiñales, burglarized a certain residence of the metropolitan area. They stole a Smith & Wesson revolver and the sum of $11 in cash. The owner of the residence notified the police and the latter commenced an investigation.

Three days later, namely, February 11, Díaz Guiñales made before a justice of the peace the following affidavit:

"I hereby declare that on February 8, 1963, around 7 a.m., Ángel Luis Torres Suárez, known as 'Jessie James,' and another whom I know as Charlie, called at my house. That they invited me to accompany them to 33d Street, block AA-3, Embalse, San José, and told me that they were going to break into a house to steal. That when we arrived at the house of Luis Díaz Horta, Jessie ordered Charlie to break open the carport padlock with a screwdriver. That Charlie broke the padlock

and entered the yard, and there broke open the kitchen door. That then they invited me to go inside and I went in with them. That we went into a room where there was a safe, and while I watched they broke it open with a crowbar and a screwdriver, but did not find any money. That then the friend, Charlie, went into an adjoining room and looked around the bed and found a revolver and a plastic bag containing $11 in quarters. That we took the revolver and the money and left for Puerta de Tierra. That Jessie James then threatened to kill me if I said anything to the police. That he distributed the money and gave $3 to me, $3 to Charlie, and Jessie kept $5 for himself. That Jessie took the revolver and afterwards gave it to me to sell it to one Marco Polo for $40. That now I know that Marco Polo's name is Juan Flores Valentín. That I gave the $40 to Jessie James, and he gave $12 to me and kept $28 for himself."

Juan Flores Valentín, married to Margarita Vega Matos —codefendant under the name of Margarita de Flores— occupied at that time a building situated on San Agustín Street, of Puerta de Tierra, which he devoted to dwelling, a barber shop, and a small business called "Marco Polo."

The following day detective Joaquín Peña made another affidavit before the same judge, describing the building and stating that he had frequented the business of Juan Flores Valentín which the latter operated "jointly with a white woman," and that "that business is frequented by individuals of ill reputation, particularly by one known as Jessie James."

On the basis of these affidavits, another detective named Luis Rodríguez Collazo applied to the Justice of the Peace of Guaynabo for a warrant to search those premises—the Marco Polo business—"for the weapon in question in order to produce it as evidence before the proper court" on the day set for the trial of the burglary case, and "to seize any other evidence or objects possessed in violation of the law." Thereupon the following search warrant was issued:

"THE PEOPLE OF PUERTO RICO, to any public peace officer in the district of the Capital City of San Juan, P.R.:

"Evidence having been presented this day, by means of an affidavit subscribed by José Enrique Díaz Guiñales, Joaquín Peña Peña, and Luis Rodríguez Collazo (copies of which are enclosed), to the effect that in an unnumbered house situated on the street known as Antigua Vía, of Puerta de Tierra, P.R., constructed of concrete and wood, zinc-roofed, with two gables, painted light gray, pink, and blue on the outside, and light gray, black, and green on the inside; bounded on the front by the street known as Antigua Vía and the housing project of the same name; on the right by an unoccupied lot where there is an unpainted concrete plant; on the rear by a two-story apartment house owned by the Méndez family; it has three doors on the front, two windows on the left, one on the right, and one on the rear; on the right and as part of the house there is a small concrete and wooden room which is locked with a padlock; on the rear there is a back room connected by a door to the *cafetín* which is installed in the front of the house; that the back room is joined to the structure of the house where the business is located; that in the upper front part of the business there is a 'Marco Polo' sign and another 'Marco Polo Barber Shop' sign in red and blue letters; that this business and back room belong to and are operated by Juan Flores Valentín, known as Marco Polo, and that a white woman, with black hair, about 21 years of age, 5 feet tall and weighing 110 pounds, helps in its administration. That on February 10, 1963, the individuals José Enrique Díaz Guiñales and Ángel Luis Torres Suárez, known as Jessie James, sold in that business to Juan Flores Valentín, known as Marco Polo, a .38 caliber Smith & Wesson revolver, series 821267, for the sum of $40, the product of the burglary perpetrated sometime on February 8, 1963, on Luis Díaz Horta at 33d Street, AA-3, ward of San José, at the place Embalse, Hato Rey, P.R.

"Therefore, you are hereby commanded to proceed forthwith, during the day or nighttime, to search the business and back room above described for the following objects: the revolver described in this warrant and any other effects or articles possessed in violation of the law.

"And if the same be found by you in whole or in part, to bring them forthwith to my presence in the District Court of Puerto Rico, Guaynabo Part, P.R."

A warrant was also issued for the arrest of Juan Flores Valentín for a violation of § 438 of the Penal Code (purchasing, receiving, and possessing, for profit, personal property knowing the same to be stolen). Between 8 and 9 p.m. of February 12 the search warrant and the warrant of arrest were delivered to police lieutenant José A. Castro for execution.

Lieutenant Castro left for Vega Baja in pursuit of Flores Valentín, where reportedly he could be found. Between one and half past one of the morning of February 13 he detained Juan Flores Valentín who was traveling to Mayagüez in his pickup truck with several workers who were going to paint his house in that city, carrying paints, brushes, rollers, and other painting equipment. The detention was made on insular highway No. 2, near the traffic light on the outskirts of the town of Vega Baja. The police made Flores Valentín and the laborers climb out of the pickup truck, took them to the Vega Baja police station where they were searched without finding anything on their person. The pickup truck was left at the place of detention in care of the police, but about half an hour after Flores Valentín was taken into custody in the Vega Baja station a policeman arrived driving the pickup truck, and upon arriving at the station another policeman who was also driving in it said, "we found a revolver here." They "asked all of them to whom it belonged. No one said." That revolver, seized by Lieutenant Castro, was identified there as the one described in the warrant especially issued for its search.

Regarding who executed the search warrant, the evidence offers two conflicting versions. Petitioners' version discloses that Lieutenant Castro, who had in his possession the search warrant, started, after the revolver had been seized and

Juan Flores Valentín arrested, on the return trip to San Juan around 4 a.m. in a police patrol; that "before reaching Buchanan" he radioed general headquarters "we already arrested Valentín, on way to search his house"; that he went directly to Puerta de Tierra, arrived there around half past four, and found the "Marco Polo" business closed; that he made defendant's wife get up and open the business; that shortly thereafter other detectives arrived at the place; that they searched the business and seized many articles; that afterwards Lieutenant Castro returned under oath the search warrant setting forth, among other things, that in compliance therewith he had carried out the search, and that the inventory of the effects attached to his oath "contains a true and detailed statement of all the effects found by him in compliance with such warrant."

The prosecution evidence tended to show that after Lieutenant Castro received the warrants for arrest and search, he had delivered the latter to detective Enrique Gómez Rodríguez for execution thereof jointly with others, having retained the warrant of arrest in order to execute it personally; that Gómez Rodríguez and his companions—who were using radio-equipped patrol cars—without knowing that the revolver to be seized in compliance with the search warrant had already been seized by Lieutenant Castro in Vega Baja, proceeded to execute the same, searching the "Marco Polo" business between four and five of that morning, and that the lieutenant arrived at the place after it had been searched and had sworn the return of the search warrant as the person responsible and head and director of its execution.

However, in the light of both versions, the basic fact was unquestionably established that the revolver, the only object to be seized under the authority of the search warrant, was materially in Lieutenant Castro's possession long before initiating and carrying out the search of the "Marco Polo" business, and that that evening Castro was acting

as such "head and director" of the warrants of arrest and search.

■ The search warrant was fully executed and carried out by the seizure of the revolver in Vega Baja. Its juridical virtuality and effectiveness to proceed afterwards to search the business had been exhausted as of the seizure. Under such circumstances, the subsequent search was unreasonable, illegal, null and void. Accepting as correct the Government's version, the lack of knowledge of the previous seizure of the revolver—attributable solely to Lieutenant Castro whose vehicle was well equipped to report forthwith, through the general headquarters, the seizure of the revolver to the detectives who had been charged at this end with the execution of the search warrant, and who also used radio-equipped patrol cars—could in nowise restore to the search warrant carried out its primitive authority, validity, and effectiveness, even though this could be considered as lack of malice on the part of the executing agents.

■ Although the addendum, in general terms, appearing in the warrant to the effect that besides the revolver they were to search for "any other articles possessed in violation of the law," does not render the search warrant wholly void, it has no legal value as being in violation of § 10, Art. II of our Constitution, and §§ 501, 503, and 506 of the old Code of Criminal Procedure in force at that time, reproduced at present by Rules 229 and 231 of the Rules of Criminal Procedure.

■ Search warrants containing such a superfluous addendum specifying nothing in particular should not be issued; it is a dangerous postscript which may be used as a pretext or excuse to interpret broadly the terms and scope of the warrant, thereby violating imperative constitutional and statutory precepts. See *People* v. *Yulfo*, 71 P.R.R. 767, 769 (1950).

■ It is not impossible to believe that in the present case the addendum was interpreted as presumptive authority for the police officers who carried out the search to seize also a great part of the merchandise, articles, objects, and things of the Marco Polo business which did not resemble at all a revolver, such as nightgowns, women's jackets, men's shirts, electric toasters, transistor radios, drills, bottles of liquor, television sets, Roman candles, screwdrivers, cartons of Chesterfield, Kent, Salem, Winston, and Pall Mall cigarettes, Moorish daggers, pruning shears, etc., "for investigation since their source had not been justified," according to the sworn inventory prepared by Lieutenant Castro who either executed the search personally, according to his affidavit of February 13, 1963, or merely accepted and approved it, according to the testimony to the contrary given by him at the hearing of the motion of November 20, 1963.

This type of general seizure of property in cases such as the present does not resemble the incidental seizure of objects during the arrest or search authorized by or in pursuance of law. On the contrary, it constitutes what we could call a police attachment of another's personal property regarding which there is no real or apparent relation with the previous or present commission of any offense, the material possession of which is not prohibited by law.[1a]

■ On the other hand, from a mere reading of the two affidavits supporting the search warrant it appears that they were not sufficient to direct that it also be executed at any time of the night, and since this is so, the search of the Marco Polo business carried out during the night of February 12 going on 13 was also illegal and void.

---

[1a] See the interesting unanimous decision of the National Supreme Court entered on January 18, 1965, in *Stanford, Jr.* v. *State of Texas*, the writer of which is Mr. Justice Stewart, published in 33 U.S.L. Week 4140–43, 379 U.S. 476.

Section 511 of the Code of Criminal Procedure, in force at that time, according to its correct Spanish version,[2] provided as follows:

"The justice of the peace must insert a direction in the warrant that it be served in the daytime unless the affidavits are positive that the property is on the person or in the place to be searched, in which case he may insert a direction that it be served at any time of the day or night."

Nor may it be inferred from burglar Díaz Guiñales' affidavit already copied, or from that of detective Peña referred to above, that they had absolute certainty, not even slightest or remotest certainty, that the stolen revolver object of the search was found "in the premises to be searched," namely, the building occupied by defendant's family and business, nor that Flores Valentín carried it on his person at the time of making those affidavits.[3]

What the former merely testified in this connection was that "Jessie James" had given me a revolver "to sell it to one Marco Polo for $40; that now I know that Marco Polo's name is Juan Flores Valentín. That I gave the $40 to Jessie James and he gave $12 to me and kept $28 for himself." He did not specify the place nor the date of such sale. For that reason it is incorrect to say in the warrant that the burglars "sold the revolver in that business to Juan Flores Valentín, known as Marco Polo."

Detective Peña, as stated above, in his affidavit merely described the building where defendant lived and had his business, and stated: "That on different occasions, during the day as well as at nighttime, I have visited the Marco Polo business at the place stated above, and I have always seen Juan Flores Valentín operating it jointly with a white

---

[2] *People* v. *Negrón*, 72 P.R.R. 825, 827 (1951).

[3] See *People* v. *De Jesús*, 73 P.R.R. 699, 703 (1952); *People* v. *Negrón, supra; People* v. *Yulfo, supra.*

woman, with black hair, about 21 years of age, 5 feet tall, weighing about 110 pounds, and this afternoon in particular I saw Juan Flores Valentín, known as Marco Polo, go out leaving the business in her care during his absence. That that business is frequented by individuals of ill reputation, particularly one known as Jessie James." He did not even mention or make reference to the revolver, nor to the place where that object was found, or would have been found at any time prior thereto.

■ We have left for ultimate consideration the exposition of the most serious ground of nullity of the search warrant. It is that no probable cause for issuance thereof appears from the two supporting affidavits, since in neither one was it said or does it appear that the revolver stolen by the three burglars on February 9, 1963, was concealed in some place, and much less in the Marco Polo business.[4]

According to § 502 (1) of the Code of Criminal Procedure which is applicable here, in the case of stolen or embezzled property the affidavit or affidavits shall describe the situs or place "in which it is concealed," or the name of the person

---

[4] As we have already stated, the revolver appeared for the first time in the hands of a policeman in the Vega Baja station, in the evening of February 12 going on 13. It was in that station where the policeman said "we found a revolver here," referring to the pickup truck which was left in care of the police at the place of defendant's detention. If the weapon was found during the search of the pickup truck on the highway and while defendant Flores Valentín was under detention in Vega Baja, the search was illegal in the light of our holding in *People* v. *Sosa Díaz,* 90 P.R.R. 606 (1964), following *Preston* v. *United States,* 376 U.S. 364 (1964).

We will say in passing that the warrant for his arrest for an alleged violation of § 438 of the Penal Code was not issued either upon probable cause, and the same is therefore null and void since it does not appear at all from the affidavits made by Díaz Guiñales and detective Peña that Flores Valentín purchased "the personal property—the revolver—knowing it to have been stolen," which circumstance is the fundamental characteristic or ingredient essential to the commission of the offense defined by that section. *People* v. *Acevedo,* 18 P.R.R. 232, 237 (1912); *People* v. *Marietti,* 31 P.R.R. 655 (1923).

who has stolen or embezzled the same, or of any other person in whose possession it is found.

It is well to reproduce here the cardinal principles on the matter which we summed up in *People* v. *Rivera*, 79 P.R.R. 697, 700 (1956), in the following paragraphs:

"The issuance of a search warrant authorizing searches and seizures is subject to the limitations pointed out by § 10 of the Bill of Rights of our Constitution, to wit: it may only be issued by judicial authority and 'only upon *probable cause* supported by oath or affirmation, and particularly describing the place to be searched . . . or the things to be seized.' Evidence obtained in violation of this section shall be, by constitutional mandate, inadmissible in the courts. L.P.R.A. Vol. 1, p. 181. Furthermore, pursuant to §§ 503 and 504 of the Code of Criminal Procedure, 'a search warrant cannot be issued but upon probable cause . . .' and the judge, before issuing the warrant, 'must . . . examine on oath the complainant, and any witness he may produce, and take their depositions in writing, and cause them to be subscribed by the parties making them.' 34 L.P.R.A. §§ 1813 and 1814. In addition, §§ 505 and 506 of that Code provide that the affidavit must set forth 'the facts tending to establish the grounds of the application, or probable cause for believing that they exist' and that the judge must issue the warrant if he is 'satisfied of the existence of the grounds of the application, or that there is probable cause to believe their existence. . . .' 34 L.P.R.A. §§ 1815 and 1816.

"The test or standard to determine whether there is probable cause cannot be expressed in inflexible and absolute terms: the question lies in determining whether the facts and circumstances are such as to warrant a man of prudence and caution to believe that the offense for which the law authorizes the issuance of a search warrant is being committed or has been committed. *Carroll* v. *United States*, 267 U.S. 132 (1925); *Steele* v. *United States*, 267 U.S. 498 (1925); *Dumbra* v. *United States*, 268 U.S. 435 (1925). Mere suspicion does not constitute probable cause, but neither is it necessary that the judge be convinced beyond any reasonable doubt that there has been a breach of the law. As indicated by the Supreme Court of the United States in *Brinegar* v. *United States*, 338 U.S. 160, 175

(1949): 'In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.' It appears thus that the juridical rule of probable cause recognizes and protects two interests at the same time: the relative demand of inviolability of the person and the need to enforce the criminal laws. And in applying such rule in each specific case, both interests must be reconciled. There is no other way of reconciling social order with individual liberty."

In view of the foregoing, the order appealed from entered in open court on April 22, 1964, in criminal cases G-63-417 and 418 filed against Juan Flores Valentín and Margarita Vega before the San Juan Part of the Superior Court, for violations of the Narcotics Act, will be set aside, and it is hereby ordered that the material possession of all the property seized during the search which may be susceptible of legal use be returned to defendants and that the proceedings be continued in a manner consistent with this opinion.